```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------X
                                      :
UNITED STATES OF AMERICA                          23 Cr. 58 (NSR)
                                      :
     - v. -
                                      :
ROBERT POPE.
                                      :
--------------------------------------X
```

## SENTENCING MEMORANDUM

Dated:   White Plains, New York
         February 28, 2024

                                                        Federal Defenders of New York
                                                        Benjamin Gold
                                                        Attorney for Mr. Pope
                                                        81 Main Street
                                                        White Plains, NY  10601
                                                        (914) 458-8128

To:  Damian Williams
     United States Attorney
     Southern District of New York
     One St. Andrew's Place
     New York, New York
     Attn:  AUSA Marcia S. Cohen

**Federal Defenders**
OF NEW YORK, INC.

Southern District
81 Main Street, Suite 300, White Plains, NY 10601
Tel: (914) 428-7124   Fax: (914) 948-5109

Barry D. Leiwant
*Interim Executive Director*
*and Attorney-in-Chief*

*Southern District of New York*
Jennifer L. Brown
*Attorney-in-Charge*

February 28, 2024

The Honorable Nelson S. Román
United States District Court Judge
Southern District of New York
300 Quarropas Street
White Plains, NY 10601

> Re:   United States v. Robert Pope
>        23 Cr 58 (NSR)

Dear Honorable Román:

When Robert Pope (herein "Mr. Pope") was a boy, he was raised by his mother, who at the time was a drug addict struggling to take care of Mr. Pope and her twelve other children. PSR ¶ 45-46, 48.[1] Life was hard for the family, who subsided on public assistance and witnessed drug use in the home. PSR ¶ 48-51 Then when Mr. Pope was a teenager, he disclosed to his mother that he was bisexual, which she did not accept: she promptly kicked young Mr. Pope out of his familial home, rendering young Mr. Pope homeless. PSR ¶ 53. Mr. Pope supported himself by prostituting himself to older men, and by staying with friends when he could. PSR ¶ 54. Miraculously, even though he was on his own, Mr. Pope was able to graduate high school and ultimately found work, but he also drank excessively and began using drugs. PSR ¶ 74-76. In late 2020, when Mr. Pope was turning 30, Mr. Pope made the biggest mistake of his life— he communicated with a sixteen-year-old and eventually met up with that child on two occasions to engage in sexual activity. PSR ¶ 8-14. While his conduct was unlawful, Mr. Pope's past is mitigating, and he is genuinely remorseful, and his unlawful conduct occurred during a particular dark time in his life. Under these circumstances, a sentence of ten-years is more than sufficient.

*Mr. Pope's Chaotic Childhood*

Mr. Pope was born in 1991 in Mount Vernon, New York. PSR ¶ 44. His mother, Tonsie Burton, abused drugs. PSR ¶ 44, 49. So did his father, Roderick Pope Sr., although he stopped using drugs after Mr. Pope was born. PSR ¶ 44, 49. Mr. Pope's parents had a tumultuous relationship which included domestic violence,

---

[1] Citations herein are to the draft PSR, as the final PSR had not yet been finalized on February 28, 2024, the date that the defense sentencing submission was due.

but they separated while Ms. Burton was pregnant with Mr. Pope, perhaps because when Ms. Burton was pregnant Roderick Pope pushed her down the stairs. PSR ¶ 49. Because of the separation and Roderick Pope's incarceration when Mr. Pope was an infant, Mr. Pope was raised primarily by his mother. PSR ¶ 49. The family lived in Mount Vernon in a neighborhood that was plagued by gang violence and drugs. PSR ¶ 48. The family was large: Ms. Burton and Roderick Pope Sr. had five children and Ms. Burton had an addition eight children with two other men. PSR ¶ 45-46. Eventually Mr. Pope began seeing his father, although the visits were infrequent. PSR ¶ 89.

Mr. Pope and his twelve siblings grew up together in Mount Vernon and relied on public assistance. PSR ¶ 48, 51. Ms. Burton continued to abuse drugs and maintained a romantic relationship with a drug dealer who provided her with drugs. PSR ¶ 51. Due to the family's financial circumstance, Mr. Pope frequently wore clothing that did not fit or that were not properly laundered, leading his peers to call him "a bum." PSR ¶ 52. Mr. Pope was bullied for this, and because of a speech impediment that hindered his ability to speak. PSR ¶ 52. Mr. Pope enjoyed sports, which led him to begin coaching baseball when he was only fifteen. PSR ¶ 52.

Academically, Mr. Pope did okay and in 2010 he was able to graduate from Mount Vernon High School. PSR ¶ 77, Mount Vernon High School Transcript (Exbhit A). At the time, his guidance counselor wrote a recommendation letter for Mr. Pope that noted "Robert has not yet reached his full potential, but has the potential and ability to succeed." Mrs. L. Greene Reference Letter (Exhibit B). She added,

> Robert has a smile that will brighten a room. I refer to Mr. Pope as a gentle giant. If you discuss anything about athletics with this young man you can hear the passion and enthusiasm in his voice. Being an athlete competing on two different athletic teams can be very challenging. Not only did Mr. Pope compete of [sic] two teams he has excelled and received accolades in both sports. As an athlete you must know how to manage your time or it can become very overwhelming. Although Robert has been faced with challenges throughout his high school career he continues to prosper. *Id.*

Mr. Pope's graduation, and the glowing recommendation letter from Mr. Pope's guidance counselor, is remarkable given the tremendous adversity that Mr. Pope experienced as a child and during high school. At sixteen and while still in high school, Mr. Pope found himself homeless because, after telling his mother that he was bisexual, she kicked him out of the familial home. PSR ¶ 53. At first Mr.

Pope thought she was not serious, as she had previously threatened to kick him out for misbehavior. PSR ¶ 52. But after coming out as bisexual his mother forced him to leave the home and Mr. Pope spent most of his time living with friends who were involved with gangs. PSR ¶ 54. Mr. Pope did not want to sell drugs, so to support himself he began prostituting himself to older men. PSR ¶ 54. This continued for the remainder of high school and into Mr. Pope's early 20s. PSR ¶ 56. *See* Dr. Gloria Pope Letter (Exhibit C) ("Robert couch surfed and made ways to take care of himself from 13 years old, when he was removed from my mother's home. . . . It wasn't until I was an adult that Robert confessed to me that these were the places where he was staying and he had to perform favors for men in order to remain there").[2]

*Adult Years*

After graduating high school, Mr. Pope briefly attended ASA College in Brooklyn but he withdrew after less than a year. PSR ¶ 55, ASA College Unofficial Transcript (Exhibit D). Mr. Pope returned to sex work and when he was twenty-one, he began dating a 46 year old man he had met while prostituting himself. PSR ¶ 56. The relationship did not last, and Mr. Pope eventually started working as a security guard, a job he maintained from 2014 through 2019. PSR ¶ 87. Mr. Pope also was active in Mount Vernon politics and worked as an umpire and at the post office and as a coach. PSR ¶ 12, 84-85. During this time period, Mr. Pope resided variously at a men's shelter, with friends and was occasionally homeless. PSR ¶ 60-61.

*The Offense*

In 2018, Mr. Pope secured his own housing in a room that he rented in Mount Vernon, New York. PSR ¶ 60. Over the next few years, he frequently used GRINDR, a social networking application that caters to gay men. PSR ¶ 12, Krueger Report, P. 3 (Exhibit E)[3]. In 2020, he was using GRINDR and connected with a sixteen-year-old.[4] PSR ¶ 12. Mr. Pope knew the boy, as he had coached him years earlier. PSR ¶ 12. The two met up twice and engaged in sexual contact, and had sexual discussions online. PSR ¶ 10-12. The boy's mother eventual discovered the relationship and Mr. Pope was promptly arrested. PSR ¶ 9, 12. On June 15, 2021, Mr. Pope was charged in state court and he ultimately pleaded guilty and was

---

[2] While Mr. Pope's sister recalls Mr. Pope being kicked out of the home at thirteen, Mr. Pope believes it was when he was sixteen. PSR ¶ 53.

[3] Because Dr. Krueger's report contains confidential mental-health information, I request permission to file this exhibit under seal.

[4] GRINDR's terms of service indicate that all users must be adults. *See* https://www.grindr.com/terms-of-service (last accessed February 27, 2024).

sentenced to four years in state prison for having engaged in sexual activity with someone under the age of seventeen. PSR ¶ 37. While the state case was pending, Mr. Pope made bail and was released on July 23, 2021. PSR ¶ 37, 59. He was arrested and charged federally on August 10, 2021 and has been detained continuously since. PSR P. 1.

*The Guidelines*

Mr. Pope pleaded guilty to enticement, a crime that carries a mandatory ten-year sentence. 18 U.S.C. § 2422(b). As detailed in the PSR and in the plea agreement, Mr. Pope's Guidelines are 188 to 235 months based on an offense level of 36. PSR ¶ 4, 33, 93, 95.

*Psycho-Sexual Evaluation*

Mr. Pope was evaluated by Dr. Richard Krueger, a clinical psychiatrist who specializes in paraphilic disorders and who is employed by the New York State Office of Mental Health to perform risk assessments and to opine about the proper care and treatment for sex offenders.[5] Dr. Krueger evaluated Mr. Pope and performed a number of risk assessments and concluded that Mr. Pope's overall risk level is low, in part because of risk instruments and also because Mr. Pope is ashamed of and remorseful for his conduct. Dr. Krueger Report, P. 9-11 (Exhibit E). More specifically, Mr. Pope's scores placed him in the low-risk range according to the following risk instruments: the SONAR, the Sexual Violence Risk-20, and the Hare Psychopathy Checklist. Dr. Krueger Report, P. 8-9. Mr. Pope fell within the "average" risk category on the Static-99 (Mr. Pope's score was 2). According to the statistics, only 4% of similarly situated individuals reoffend within five-years of their release from custody. Krueger Report, P. 8. Moreover, Dr. Kruger notes that therapy and substance abuse counseling would "further reduce" any remaining risk.

### *The Most Appropriate Sentence: Ten Years*

As Your Honor is well aware, in selecting a sentence this Court takes as its "lodestar the parsimony clause of 18 U.S.C. § 3553(a)." *United States v. Douglas*, 713 F.3d 694, 700 (2d Cir. 2013). That provision directs sentencing courts to "'impose a sentence sufficient, but not greater than necessary, to comply with' the factors set out in 18 U.S.C. § 3553(a)(2)," i.e., "proportionality, deterrence, incapacitation, and rehabilitation." *Id*. In *United States v. Ministro-Tapia*, 470 F.3d 137 (2d Cir. 2006), the Second Circuit explained that if the Court believes a lower sentence will be as effective as a higher sentence in serving the purposes of sentencing, **it must choose the lower sentence**. *See id*. at 142 (observing that where a guidelines sentence is "in equipoise with [a] below-the-range sentence," the

---

[5] A summary of Dr. Krueger's professional background is available online at https://www.columbiapsychiatry.org/profile/richard-b-krueger-md (last accessed on February 26, 2024).

parsimony clause requires imposition of the lower sentence). In this case, ten years of incarceration is more than sufficient.

### A. The Court Should Not Give Deference to USSG § 2G1.3

Following *United States v. Booker*, 543 U.S. 220 (2005), sentencing judges are invited to question whether a particular guideline properly reflects the considerations in 18 U.S.C. § 3553(a). *Rita v. United States*, 551 U.S. 338, 351, 357 (2007). The district court may determine that a case warrants a non-guidelines sentence because it "falls outside the 'heartland'" to which the Sentencing Commission intended individual guidelines to apply, because the Guidelines reflect unsound judgment or overstate the appropriate sentence, or because the guidelines fail properly to reflect § 3553(a) considerations. *Id.* Further, sentencing judges "may vary [from Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines." *Kimbrough v. United States*, 552 U.S. 85, 101 (2007).

The utility of a particular guideline depends on whether the Sentencing Commission, in promulgating and amending it, has acted in "the exercise of its characteristic institutional role." *Id.* at 109. That role is to formulate guidelines based on "empirical data and national experience, guided by a professional staff with appropriate expertise." *Id.* Where a particular guideline produces harsh sanctions that are not based on empirical data, national experience, and Commission expertise, courts may conclude that it "yields a sentence 'greater than necessary' to achieve § 3553(a)'s purposes, even in a mine-run case." *Id.* at 109-110.

The guideline applied to Mr. Pope's, U.S.S.G. § 2G1.3, and the draconian sentencing ranges it yields are not based on empirical data, national experience, and Commission expertise and are unworthy of deference. U.S.S.G. § 2G1.3 was promulgated in 2004 with a base offense level of 24 to account for mandatory minimum terms of imprisonment established by Congress. *See* U.S.S.G. app. C, vol. III, amend. 664 (eff. Nov. 1, 2004). In 2007, after Congress, through the Adam Walsh Act, raised the mandatory minimum for § 2422(b) enticement offenses from 5 to 10 years, the Commission raised § 2G1.3's base offense level to 28 to reflect that change. *See* U.S.S.G. app. C, vol. III, amend. 701 (eff. Nov. 1, 2007). In other words, the enticement guideline was ratcheted up without regard for empirical data. The result is a guideline that provides a poor mechanism for determining a just sentence. *See, e.g.*, *Kimbrough*, 552 U.S. at 109 (finding crack-cocaine guidelines unduly harsh where the Sentencing Commission based its decision on mandatory minimum sentencing schemes rather than empirical data and national experience).

Moreover, Mr. Pope's case is somewhat unique from the typical enticement case. The legislative history of § 2422(b) makes clear that the statute was meant to punish "pedophiles" who "have used the Internet to seduce or persuade children to meet them to engage in sexual activities." H.R. Rep. 105-557, at 12. The Congressional record emphasizes this point more than once, noting that the legislation of which § 2422(b) was a part "attacks pedophiles who stalk children on the Internet." *Id.* In short, the statute was meant to "provid[e] law enforcement with the tools it needs to . . . bring to justice those individuals who prey on our nation's children." *Id.* at 10. Unlike many defendants charged with § 2422(b), Mr. Pope is not a pedophile. Yes, he engaged in unlawful sexual contact with a sixteen-year-old, but he me the child on an online dating site that is intended for adults. Put another way, he didn't lure a child – instead, he found a child who was interested in meeting up. Of course, this was wrong and Mr. Pope deserves to be punished as children cannot consent to sexual encounters, but a sentence greater than ten-years of incarceration is more than necessary for this particular case.

Indeed, although Mr. Pope's use of the Internet and his phone to communicate with the teen subjects him to federal prosecution, his actions more closely resemble the conduct he was convicted of in state court: Criminal Sexual Act in the 3rd Degree. That statue, NYPL § 130.40, prohibits an adult from having sexual contact with someone less than seventeen. Notably, this offense is classified as an E-felony that is punishable by no more than four years' imprisonment. NYPL § 70.80(4)(a)(iv). The tremendous disparity between the stipulated guidelines and the four year maximum penalties under New York law for the exact conduct shows that the federal guidelines are unreasonable as applied to Mr. Pope's case.

B. *The Nature and Circumstances of Mr. Pope's Conduct Do Not Compel Incarceration Beyond Ten-Years. 18 U.S.C. § 3553(a)(1)*

Mr. Pope understands that he must be punished for having two sexual meetups with a sixteen-year-old. But ten years in prison is sufficient given that Mr. Pope's conduct, while unlawful, was non-violent and involved consensual encounters with a teenager who was one-year away from New York's age of consent.[6] *See* NYPL § 130.05(3)(a)("A person is deemed incapable of consent when he or she is: (a) less than seventeen years old").

---

[6] Of course, consensual encounters with minors are, by their nature, non-consensual. But it is relevant that Mr. Pope did not use violence or threats or force and the fact that no such aggravators exist in this case demonstrates why a sentence of ten-years is more than sufficient.

    *C. Mr. Pope's History and Characteristics Support Leniency.  18 U.S.C. § 3553(a)(1).*

This case represents the first time Mr. Pope has been incarcerated or charged with a felony offense, which is significant given that Mr. Pope grew up with little guidance in a home where drug use and gang violence was rampant.  Mr. Pope's past is sympathetic: he was kicked out of his familial home as a teenage when his mother discovered that he was bisexual, which led young Mr. Pope to engage in sex work with older men to support himself, which means that Mr. Pope was also sexually victimized as a teenager.  Despite being homeless and having no adult supervision, Mr. Pope was able to graduate high school, attend some college and find employment.  This is grounds for a variance.

Additionally, Mr. Pope's remorse is noteworthy and grounds for a variance. He told Dr. Krueger that he was "feels enormously guilty," Dr. Krueger Report, P. 9, and he expressed similar sentiment to Your Honor, writing,

> I would like to say I am Sorry [sic] to the courts, the prosecutors, my lawyers, my family, my friends, my supporters, my church, and most importantly, the Victim's Family for my actions.  I acknowledge that what I have done was completely wrong.  Words cannot express how sorry I am to the victim and sorry for all the harm I brought the victim, the victim's family, my own family, and anyone else that might have been affected by my actions.  I want to make it clear that I do not want to make excuses for my actions.

Robert Pope Letter (Exhibit F).

Mr. Pope's remorse is reflected in both his words and his actions.  In addition to apologizing, he waived prosecution by indictment, pleaded guilty without filing motions or asking for full discovery, and he's been a model inmate while incarcerated.  PSR ¶ 5.  While at the Westchester County Jail, Mr. Pope lead bible study and trained to become a minister and participated in the jail's programing. PSR ¶ 6.  His devotion to the jail's religious community was so strong that Reverand Dr. Jim Bostic, who serves as a volunteer chaplain at the jail, wrote a letter to the Court describing Mr. Pope as an "avid student of the bible" who "not only espouses to its contents, but he lives it out in the midst of a population of men many of which have reprobate minds, and who seem unable or unwilling to change."  Rev. Dr. Jim Bostic Letter (Exhibit G).  Reverand Bostic explains that Mr. Pope "leads his cell block daily in prayer and Bible Study, not as a pastime, but a genuine way of life" and he notes that Mr. Pope "spends almost all his waking hours trying to help other inmates make that same change that he has managed to make in his time [at the Westchester County Jail]."  *Id.*  A similar sentiment was expressed by Chaplain

Vicki Mills, who also met Mr. Pope at the Westchester County Jail.  Chaplain Vicki Mills Letter (Exhibit H).  Chaplain Mills explains that Mr. Pope "has shown great remorse," has "changed his behavior and his way of thinking," and "actively participates in weekly Bible studies and the weekly church service . . .[w]hich has been helping him in his rehabilitation towards his new outlook on life." *Id.*[7]

Also noteworthy is Mr. Pope's dedication to his family and his community.  A friend explains that Mr. Pope "would do anything he could to help anyone around him in need!  I have literally seen him give his shirt off his back to a person in need without one question asked."  Michael Borger Letter (Exhibit J).  Mr. Pope's sister Juanita explains that Mr. Pope "is very passionate about helping others, volunteering in the community and [being] an active member of his church," Juanita Pope Letter (Exhibit K), and his mom adds that when she had a "bad stroke," Mr. Pope "was there for me every step of the way" and that it is has therefore been "hard without him" and his "support."  Tonsie Burton Letter (Exhibit L).  *See also* Lisa Pope Letter (Exhibit M) ("I have witnessed firsthand the kindness, compassion, and generosity that define him as a person"); Veronica Pope Letter (Exhibit N) ("[Mr. Pope's] dedication to his passions and his willingness to always lend a helping hand to others are qualities that I deeply admire and respect")[8]; Danaija Burton Letter (Exhibit O) ("Robert is a devout Christian who lives by the principles of compassion, forgiveness and service.  He found his fulfillment in helping others"); Rev. Erwin Lee Trollinger Letter (Exhibit P) ("During my eleven years of pastoring Mr. Robert Pope became a member of the church.  Mr. Pope . . . was extremely helpful to work of ministry that related to painting and doing different types of maintenance work in and out of the church building"); William Allen Letter (Exhibit Q) ("Robert has always been honest, helpful, and considerate of others. . .Robert has [also] expressed regret").

Under these circumstances, and especially in light of his resilience and his dedication to his community and his family, Mr. Pope's history and characteristics justify leniency.

    D. *A Ten-Year Sentence Would Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment.  18 U.S.C. § 3553(a)(2)(A).*

---

[7] A copy of additional certificates and accolades that Mr. Pope has received while incarcerated is attached as Exhibit I.

[8] Veronica Pope's letter also discusses how Mr. Pope "is the person who wants his entire family to spend holidays at soup kitchens volunteering to feed the less fortunate Robert is the one to ask for all of my kids unused toys to give to children who don't have, Robert is the one who drops anything to help a person in need."

Mr. Pope has never before spent any time incarcerated or separated from his community.  Because of his actions, Mr. Pope has lost the ability to coach sports, which was one of his passions.  If he receives a ten-year sentence, Mr. Pope will be released when he in his young 40s, meaning he will have lost his freedom for the vast majority of his 30s.  And when he is finally released, Mr. Pope will be subjected to post-release supervision and will face a lifelong of collateral consequences, including compliance with the sex offender registry.  These are serious consequences, especially for someone who has never been in trouble before. Under these circumstances, and especially in light of Mr. Pope's remorse and his eagerness to receive treatment, a sentence beyond ten-years is more than necessary.

E. *Mr. Pope has Been Specifically Deterred, and a Ten-Year Sentence Would Provide Ample General Deterrence and would Sufficiently Protect the Public. 18 U.S.C. §§ 3553(a)(2)(B) and (C).*

Mr. Pope has been specifically deterred.  Because of his conduct, Mr. Pope was arrested and detained and as noted above, a sentence of ten-years will result in Mr. Pope being incarcerated throughout the bulk of his 30s, which lowers Mr. Pope's recidivism risk considerably because recidivism rates drop as defendants age.

*Data from the Sentencing Commission*[9]



**Recidivism and Age**

- Studies have repeatedly shown older offenders to have a lower risk of reoffending[7] and the Commission's study confirmed this finding.  Just 16.0% of offenders older than 60 years of age at the time of release were rearrested.  In comparison, more than two-thirds (67.6%) of offenders younger than 21 at the time of release were rearrested.

- For each age group studied, the older the age group, the lower the rearrest rate.  The same trend holds true for both reconviction and reincarceration rates.[8]

**Rearrest Rates of Offenders by Age at Release**

LT 21 yrs: 67.6%
21-25 yrs: 66.4%
26-30 yrs: 62.2%
31-35 yrs: 55.3%
36-40 yrs: 48.8%
41-50 yrs: 42.4%
51-60 yrs: 24.7%
GT 60 yrs: 16.0%

Moreover, Mr. Pope was evaluated by Dr. Krueger, who noted that Mr. Pope acknowledged his unlawful conduct and expressed remorse for his conduct, which suggests that he will not reoffend.  Additionally, Dr. Krueger evaluated Mr. Pope and determined that Mr. Pope's overall risk of reoffending was relatively low,

---

[9] This screenshot is from a United States Sentencing Commission Report titled *Report at a Glance: Recidivism and Federal Sentencing Policy*.  A copy of this report is attached as Exhibit R.

especially if he receives treatment. Dr. Krueger Report, P. 9-11.[10] Under these circumstances, a sentence of ten-years is more than sufficient.

Regarding general deterrence, ten-years of incarceration is a long period of time and would provide ample general deterrence. This is because studies have shown that more severe sentences do not result in greater general deterrence. Michael Tonry, Purposes and Functions of Sentencing, 34 CRIME AND JUSTICE REVIEW: A REVIEW OF RESEARCH 28-29 (2006) ("[I]ncreases in severity of punishment do not yield significant (if any) marginal deterrent effects. . . . Three national Academy of Science panels, all appointed by Republican presidents, reached that conclusion, as has every major survey of the evidence."). It is the certainty of being prosecuted rather than the severity of punishment that deters crime. See Nat'l Inst. of Just., Five Things About Deterrence, Jun. 6, 2016. The fact that Mr. Pope was arrested, prosecuted, convicted and sentenced to five-years in custody, will provide sufficient general deterrence.

\*   \*   \*

There is nothing to be gained by a draconian sentence in this case, especially in light of Mr. Pope's sympathetic past and the fact that he is remorseful and is also

---

[10] Probation noted that Mr. Pope declined to participate in an independent psychosexual evaluation. PSR ¶ 72. While this is true, his decision not to participate in a second evaluation should not be used against Mr. Pope. First, Mr. Pope was under no legal obligation to participate in a second evaluation. Second, Mr. Pope had good reason to resist secondary testing, as it would have delayed Mr. Pope's sentencing, which could very well have resulted in Mr. Pope serving more time in custody. This is because Mr. Pope's state sentence (he received four years) is expected to be complete in early 2024 (counsel has not been able to get a definite answer as to when his state sentence will be complete, but Mr. Pope believes his state sentence could be completed at the end of March due to state good-time credits and the fact that Mr. Pope has been in custody for over thirty months). Pursuant to USSG § 5G1.3(b)(1), a defendant is entitled to have a sentence adjusted for incarceration served in relation to other offenses that were "relevant conduct" to the federal offense if "the court determines that such period of imprisonment will not be credited to the federal sentence." Here, Mr. Pope served time in state custody (roughly 38 days) for his state offense which constitutes relevant conduct as the federal prosecution is based on the exact same conduct. This custody, however, will not be credited by BOP as Mr. Pope served the time in state custody so he was not in "official detention". See 18 U.S.C. § 3585(b). USSG § 5G1.3(b) allows the court to credit Mr. Pope with this term of incarceration, but only if the state sentence is "undischarged." Because of this, Mr. Pope did not want to risk delaying his federal sentencing as if he sentenced federally after his state sentence is complete the BOP may not credit this time. See 18 USC § 3585 and USSG § 5G1.3(b).